**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronnie Joseph BRICKEY,
Defendant–Appellant.**

**No. 00–10561.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 2002.

Filed May 16, 2002.

---

3. In light of our holding, we of course express no view as to the merits of the employees' breach of contract claim.

Atmore L. Baggot, Apache Junction, Arizona, for the defendant-appellant.

Robert E. Lindsay, Alan Hechtkopf, Gregory Victor Davis, Attorneys, Tax Division, Department of Justice, Washington, DC, for the plaintiff-appellee.

---

Before: GOODWIN and TROTT, Circuit Judges, and EZRA,* District Judge.

EZRA, District Judge.

Defendant–Appellant Ronnie Joseph Brickey ("Defendant") appeals his jury trial conviction and sentence for willfully making a false income tax return (26 U.S.C. § 7206(1)) and attempting to evade income taxes (26 U.S.C. § 7201). We have jurisdiction pursuant to 18 U.S.C. § 3742 and 28 U.S.C. § 1291 and we affirm.

## I. FACTS

Defendant worked as a border inspector for the Immigration and Naturalization Service ("INS") at the San Luis, Arizona, Port of Entry, beginning in August 1996. During 1997, Defendant received more than $120,000 in income by participating in a scheme whereby cars were permitted to cross into the United States from Mexico without subjecting them to routine inspection. Defendant failed to report this income on his 1997 federal income tax return, and failed to pay income tax on the funds.

An indictment charging the two tax offenses was returned on August 18, 1999, and Defendant first appeared before a Magistrate Judge on August 24, 1999. The first Pretrial Motion was filed on June 8, 2000. Defendant's trial counsel filed six motions for extensions of time within which to file pretrial motions and to reschedule trial of the case. The district court granted all 6 continuances. A seventh motion to continue the trial was granted in order to ensure the continuity

---

\* The Honorable David Alan Ezra, Chief United States District Judge for the District of Hawaii, sitting by designation.

of government counsel. The trial commenced on July 11, 2000.

Defendant enlisted in the United States Marine Corps in October 1990. In August 1991, defendant married Veronica Brickey Garcia ("Veronica"). Upon their marriage, Defendant and Veronica moved to Hawaii, where Defendant remained in the Marine Corps, earning less than $15,000 per year, and Veronica worked as a caregiver earning minimum wage. Defendant left the Marine Corps in October 1994, going to work as a janitor and mechanic, and continuing to receive low wages. During 1995 and 1996, Veronica was employed as a medical assistant, still earning minimum wage. When Defendant began working for the INS in August 1996, his starting salary was approximately $20,000 per year, which he elected to have directly deposited into his bank account. In 1997, Defendant's gross wages as an INS inspector totaled $31,414.51. Defendant continued to work for the INS through the time of trial.

Beginning sometime between March and May of 1997, Defendant purchased several expensive items including a new truck, numerous computer gadgets, a digital camera, a laptop computer, a new car, and furniture. Many of these items were paid for in cash. In July 1997, Veronica overheard a telephone conversation that Defendant had with his uncle Pablo Cordova–Barva ("Pablo"). Defendant told Pablo that Defendant was getting low and asked "when were they going to be crossing more tacos." Defendant then stated, "so you are going to be coming in El Paloma," and told Pablo, "just make sure there is someone across the border in the hotel watching me, because they switch lanes every 30 minutes." After this conversation, Veronica asked Defendant whether he was doing "dirty business" with his uncle. Defendant responded, "I just had to close my eyes and I would get $15,000 per car. My uncle was the one arranging the cars that would go across the border."

Beginning in early July 1997, when Pablo visited Defendant and Veronica's home, Veronica saw Defendant in possession of large amounts of cash. On one occasion, after Defendant and Pablo left the bedroom, Veronica entered and discovered a bank bag containing packs of money in denominations of $20 and $50 in a drawer. At a later time, Veronica walked into the bedroom and saw her queen-size bed covered with packs of money. On that occasion, Defendant telephoned Pablo and said he was missing some money. Twice after Defendant returned from taking his two sons to Mexico, Veronica saw currency in the diaper bags she had given Defendant to take with the children.

On December 17, 1997, after an argument with Defendant, Veronica went to the port of entry where Defendant worked and asked to speak with a supervisor. Veronica spoke with two government agents and told them what the Defendant had been doing. The following day, Veronica left Arizona to visit her aunt in California. On December 27, 1997, upon her return to Arizona, Defendant presented Veronica with a diamond bracelet. On December 29, 1997, Veronica met with Defendant again, and Defendant asked her to retract all of the statement she had made to the officials at the port of entry. That same day, Veronica accompanied Defendant to his attorney's office. Defendant's attorney referred Veronica to a second attorney, who prepared a letter on Veronica's behalf stating that she intended to recant the statements she had made to the officials at the port of entry. At trial, Veronica acknowledged that her statements to the two attorneys were untrue.

Defendant engaged Juan Evangalista, the owner of a tax preparation business, to prepare Defendant's 1997 federal income

tax return. Evangalista prepared the return using information Defendant provided. When Evangalista asked Defendant whether his wages from the INS were his sole income for 1997, Defendant answered that they were, denying that he had any other income. Defendant's 1997 Form 1040A reported an adjusted gross income of $31,415. After adjustments for the standard deduction for a person using married filing separately filing status, and for one personal exemption, Defendant's return showed a taxable income of $25,315, and a tax due of $4,413.

Brian Leighton, an IRS Special Agent, used the bank deposits plus cash expenditures method of proof to determine Defendant's 1997 gross income. Adding the bank deposits total of $23,345.23, the $8,479.26 withheld from Defendant's gross income that was not deposited into the bank accounts, and Defendant's total cash expenditures for 1997 of $130,264.64, Leighton arrived at a figure of $162,089.13 for bank deposits plus cash expenditures. Leighton then made certain adjustments to the figure to eliminate the possibility of double counting. Using the corrected figure of $155,830.70, IRS revenue agent John Carroll determined that Defendant's actual taxable income was $149,730.70. Applying the pertinent tax rate to this number, Carroll determined that Defendant's 1997 tax liability was $46,448.71, instead of the $4,413 reported on Defendant's return. After deducting the tax already paid, Carroll found that Defendant had tax due and owing of $42,035.71 for 1997.

Defendant denied causing loads of illegal drugs to enter the United States or closing his eyes to allow drug cars across the border. He also denied that any of the money he spent during 1997 was income to him for that year, claiming instead that all of the funds had come from savings he had accumulated. Defendant stated that the $15,000 he placed in his brother Sergio's name at Warehouse Electronics was provided by Defendant's mother. Blanca Elena Koehn–Cordova, Defendant's mother, also testified that she provided the $15,000 used to open the account in Sergio's name, money she claimed to have saved from social security payments made to her and on behalf of her children.

## II. PROCEDURAL BACKGROUND

Defendant was charged with one count of attempting to evade taxes, in violation of 26 U.S.C. § 7201, and one count of willfully making a false federal income tax return signed under penalties of perjury, in violation of 26 U.S.C. § 7206(1). On July 21, 2000, the jury returned verdicts finding the Defendant guilty on both counts.

At sentencing, the district court adopted the Presentence Report in its entirety, enhancing Defendant's base offense level for "abuse of trust," pursuant to U.S.S.G. § 3B1.3, and failure "to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity," pursuant to U.S.S.G. § 2T1.1(b)(1)(1998).[1] On October 25, 2000, the district court sentenced Defendant to thirty-seven months' imprisonment as to Count 1, and thirty-six months' imprisonment as to Count 2, to run concurrently with each other, followed by three years' supervised release. The district court also ordered Defendant to pay a fine of $40,000 and a special assessment of $200. The judgment was entered on October 27, 2000, and filed on November 1, 2000. Defendant filed a timely notice of appeal on November 1, 2000.

---

1. All references in this opinion are to the November 1, 1998 Guidelines Manual in force at the time of Defendant's sentencing.

### III. *DISCUSSION*

#### A. SPEEDY TRIAL ACT

■ "We review the district court's disposition of a Speedy Trial Act issue for clear error as to factual findings and de novo as to application of legal standards." *United States v. Berberian,* 851 F.2d 236, 239 (9th Cir.1988); *see also United States v. Henderson,* 746 F.2d 619, 622 (9th Cir. 1984), *aff'd,* 476 U.S. 321, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986).

> Under the Speedy Trial Act,
>
> [i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an ... indictment with the commission of an offense shall commence within seventy days from the filing date ... of the ... indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1).

In this case, the indictment charging the two tax offenses was returned on August 18, 1999, and Defendant first appeared before a Magistrate Judge on August 24, 1999. Defendant contends that the Speedy Trial Act was violated as his trial should have commenced on November 2, 1999, but did not commence until July 11, 2000. Therefore, Defendant argues this Court should reverse his conviction and dismiss the indictment.

Under the Speedy Trial Act, excluded in computing the time within which trial must commence are "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion," and "[a]ny period of delay resulting from a continuance granted by any judge ... if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."

18 U.S.C. § 3161(h)(1)(F) & (8)(A). However, for time to be excludable under the ends of justice provision, the district court must set forth, in the record of the case, "its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A).

■ The remedy for violation of the Speedy Trial Act is dismissal of the case, on motion of the defendant. 18 U.S.C. § 3162(a)(2). However, "[f]ailure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under [the Speedy Trial Act]." *Id.; see also Berberian,* 851 F.2d at 239–240; *United States v. Stone,* 813 F.2d 1536, 1538 (9th Cir.1987); *United States v. Brown,* 761 F.2d 1272, 1276–77 (9th Cir. 1985). The Act provides for no exception to the waiver of the right to dismissal for failure to make a timely motion. *United States v. Westbrook,* 119 F.3d 1176, 1184 (5th Cir.1997).

Defendant has waived his right to dismissal under the Speedy Trial Act. Defendant admits that his trial counsel never moved for a dismissal of the indictment for violation of the Speedy Trial Act, and Defendant made no attempt to separately assert his right to a speedy trial.

■ Moreover, there has been no violation of the Speedy Trial Act. In the first 5 instances of granting the continuances the district court specifically referred to the statutory provisions setting forth factors it considered in granting those continuances. Those statutory references, in conjunction with the reasons elaborated in the defense motions seeking the extensions, and the district court's reference to the motions in its orders, constitute sufficient explanation of why the ends of justice served by granting the continuances outweighed the inter-

ests of the Defendant and the public in a speedy trial. Therefore, any delay resulting from these motions is excluded in computing the time within which trial must commence. Thus, 212 days were excluded by the court's first five continuance orders. 321 days elapsed between Defendant's first appearance after the indictment, on August 24, 1999, and the commencement of the trial on July 11, 2000. Therefore, only 62 days of non-excludable time elapsed from the date of Defendant's first appearance until the time the date the trial commenced. Consequently, there was no violation of the Speedy Trial Act.

## B. SUFFICIENT EVIDENCE TO SUPPORT THE VERDICT

We review the sufficiency of the evidence supporting a conviction by examining whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Willard,* 230 F.3d 1093, 1095 (9th Cir.2000); *United States v. Ruiz–Lopez,* 234 F.3d at 447; *United States v. Deeb,* 175 F.3d 1163, 1168 (9th Cir.1999); *United States v. Cusino,* 694 F.2d 185, 187 (9th Cir.1982).

▮ Defendant argues that there is no evidence that the allegedly unreported 1997 income was received during 1997 instead of 1996. Therefore, Defendant contends that his motion for acquittal should have been granted. Defendant's argument is without merit.

The government's proof at trial, when viewed in the light most favorable to the prosecution, clearly establishes that a rational trier of fact could conclude that Defendant received substantial income during 1997 that he did not report on his federal income tax return for that year. The evidence at trial established that during 1997, $23,345.23 was deposited into Defendant's bank accounts and Defendant made cash expenditures totaling $130,264.01. The government's evidence also proved that the $130,264.01 in unreported cash was income that Defendant should have reported on his federal income tax return. The testimony of Defendant's former wife also supports this conclusion. She testified about their finances during the relevant period. She was responsible for paying household bills during her marriage to Defendant, and, as his spouse, knew of his disposable income, his lifestyle, and spending habits. Given all of the evidence produced at trial, a rational factfinder could easily conclude that Defendant received substantial income in 1997 that he did not report on his federal income tax return for that year.

## C. NET WORTH

▮ The legal requirements with respect to a method of proof are questions of law, subject to review *de novo. United States v. Stephens,* 237 F.3d 1031, 1033 (9th Cir.2001); *United States v. Hunter,* 101 F.3d 82, 84 (9th Cir.1996).

▮ Defendant asserts that the district court should not have permitted the government to offer evidence of bank deposits plus cash expenditures without requiring the government to establish Defendant's opening net worth. Defendant offers no legal support for this assertion. The case law cited by Defendant holds that the government must establish an opening net worth when using the *increase in net worth method* of proving income within a tax year. *See Holland v. United States,* 348 U.S. 121, 132, 75 S.Ct. 127, 99 L.Ed. 150 (1954). The Defendant merely states that this same rule should be applied when the government uses the "cash deposits plus expenditures" method. However, no legal support is advanced for this position. The Defendant's argument is unpersuasive.

In contrast, the government cites clear precedent for the proposition that there is no need for the government to establish the Defendant's opening net worth when using the "bank deposits plus cash expenditures" method. *See United States v. Conaway,* 11 F.3d 40, 43 (5th Cir.1993); *United States v. Abodeely,* 801 F.2d 1020, 1023–24 (8th Cir.1986); *United States v. Soulard,* 730 F.2d 1292, 1298 (9th Cir. 1984); *Percifield v. United States,* 241 F.2d 225, 230 (9th Cir.1957).

■ Under the bank deposits plus cash expenditures method of proof, after bank deposits have been added together and nontaxable amounts are eliminated, the amount of expenditures made using cash that had not been deposited into the bank accounts is added to derive gross income. *Percifield,* 241 F.2d at 229 n. 7. In the instant case, the government's proof fully comported with the requirements of the bank deposits plus cash expenditures method of proof. There is no requirement that opening net worth be established when using this method of proof. Therefore, the government was not required to prove Defendant's opening net worth.

D. $40,000 FINE

■ We generally review a district court's finding that a defendant has sufficient financial resources to pay a fine for clear error. *United States v. Scrivener,* 189 F.3d 944, 953 (9th Cir.1999); *United States v. Ladum,* 141 F.3d 1328, 1344 (9th Cir.1998); *United States v. Favorito,* 5 F.3d 1338, 1339 (9th Cir.1993). Where a defendant fails to object at sentencing to an order that he pay a fine, this Court may consider the issue only where "exceptional circumstances" exist. *See United States v. Flores–Payon,* 942 F.2d 556, 558 (9th Cir. 1991). Where the "exceptional circumstances" exception applies, we review the disputed factual determination under the plain error standard. *See United States v.*

*Hernandez–Rodriguez,* 975 F.2d 622, 628 (9th Cir.1992).

Defendant maintains that he did not object to the amount of the fine in the district court because he was not given an opportunity to do so since he and his attorney had concluded their remarks prior to the prosecutor's request that the court assess a fine. He further contends that immediately after the request for the fine was made, the court imposed the sentence without providing an opportunity for comment by either the Defendant or his attorney. In any event, Defendant's argument that there was no showing of sufficient assets to pay a fine lacks merit.

■ The district court ordered Defendant to pay a fine of $40,000, which was within the applicable guideline range. U.S.S.G. § 5E1.2(c)(3). The Guidelines provide that a fine shall be imposed "in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Defendant has the burden of proof to demonstrate that he cannot pay the fine. *United States v. Quan–Guerra,* 929 F.2d 1425, 1427 (9th Cir.1991); *see United States v. Rafferty,* 911 F.2d 227, 232 (9th Cir.1990).

■ In the instant case, Defendant failed to demonstrate that he was incapable of paying the fine. First, Defendant refused to discuss his finances with the Probation Officer. *Rafferty,* 911 F.2d at 232 (defendant failed to meet his burden where, upon advice of counsel, he refused to provide any information regarding his financial status to the probation officer.) Moreover, Defendant failed to establish that he would not become able to pay the fine while incarcerated and within the thirty-six month period during which he will be under supervised release. The presentence report made it clear that Defendant had skills in auto mechanics, welding, elec-

tronics, and air conditioning repair, skills that could reasonably be expected to generate a good income. *See United States v. Stoddard,* 150 F.3d 1140, 1147 (9th Cir. 1998); *United States v. Sablan,* 92 F.3d 865, 871 (9th Cir.1996) (no abuse of discretion in imposing restitution on indigent defendant who has an education and skills that can still be used on the job market.) Considering these factors, Defendant has failed to meet his burden of establishing an inability to pay. *See Quan–Guerra,* 929 F.2d at 1427.

■ In addition, there is sufficient evidence to support the district court's finding that Defendant had the ability to pay a $40,000 fine. At sentencing, the district court inquired about the vehicles and other property that Defendant had purchased. Without any contradiction by Defendant, the government informed the court that it had not seized Defendant's truck, stereo equipment, or any of the other property Defendant had acquired. [S.Tr. 13–14.] Given these assets, the district court could reasonably conclude that Defendant would be able to raise funds to pay the $40,000 fine. *See United States v. Ortland,* 109 F.3d 539, 549 (9th Cir.1997); *United States v. Eureka Lab., Inc.,* 103 F.3d 908, 913 (9th Cir.1996). Accordingly, the district court did not err in imposing the fine.

## E. SENTENCING ENHANCEMENT UNDER U.S.S.G. § 3B1.3

■ The application of the abuse of trust enhancement is a mixed question of fact and law, which we review *de novo. United States v. Isaacson,* 155 F.3d 1083, 1084 (9th Cir.1998); *United States v. Ferrin,* 994 F.2d 658, 665 (9th Cir.1993).

Defendant argues that the district court should not have applied the abuse of trust enhancement under U.S.S.G. § 3B1.3 to increase his offense level by two levels.

The Sentencing Guidelines mandate a two-level increase in a Defendant's offense level "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. For the abuse of trust enhancement to apply "the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense" (*e.g.,* by making the detection of the offense or the defendant's responsibility for the offense more difficult.) U.S.S.G. § 3B1.3, cmt n. 1. The abuse of trust enhancement "may not be employed if an abuse of trust ... is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3

The district court imposed a two-level enhancement under § 2T1.1(b)(1) for "fail[ing] to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity." Defendant argues that because the two-level enhancement made pursuant to § 2T1.1(b)(1) took into consideration the fact that he had generated his income "by means of criminal activity in breach of the trust reposed in him as an INS border inspector" it constituted impermissible double counting to also enhance the offense level by two levels for abuse of a position of trust. Defendant also asserts that abuse of a position of trust is part of the statutory offenses of tax evasion and filing a false income tax return. Defendant further maintains that the relationship of a government employee to the IRS is not one of special trust within the meaning of § 3B1.3. Finally, he argues that as a government employee Defendant was not in a position of trust.

### 1. Double Counting

■ Defendant's argument that abuse of trust is part of the statutory offense of tax evasion and filing a false

income tax return is unpersuasive. Taxpayers do not, as such, occupy a position of public or private trust within the contemplation of the pertinent Sentencing Guidelines. Public or private trust, as considered for the abuse of trust enhancement, refers to "a position of public or private trust characterized by professional or managerial discretion (*i.e.,* substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n. 1. The government correctly maintains that taxpayers do not by virtue of the tax laws occupy a professional or managerial position; and while the tax laws depend on public cooperation, they do not vest discretion in taxpayers with respect to their obligations. Additionally, U.S.S.G. § 2T1.1 dictates a base offense level for tax crimes based solely on the amount of tax loss involved; it does not consider who committed the offense or in what manner the offense was committed. Similarly, the specific offense enhancement for income received from an illegal source does not take into consideration the manner in which the illegal income was derived. The enhancement applies regardless of whether criminal conduct from which income was derived involved abuse of a position of trust. It is possible to fail to report income from a criminal activity that does not abuse a position of trust and receive an enhancement solely on those grounds. When a position of trust has been abused in committing the criminal conduct, this is not taken into account by the previous enhancement. Therefore, both enhancements are appropriate in situations where criminal conduct has been committed by abusing a position of trust.

### 2. Relationship of Government Employee to IRS

▆▆▆ Defendant argues that as a taxpayer who is also a government employee responsible for enforcing immigration and customs laws he did not occupy a position of trust vis-a-vis the IRS and that his position in no way facilitated his tax crimes.

▆▆▆ The critical inquiry with regard to the application of the abuse of trust enhancement is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Isaacson,* 155 F.3d 1083, 1086 (9th Cir. 1998) (citation omitted); *see also United States v. Medrano,* 241 F.3d 740, 745 (9th Cir.2001). In this case, Defendant's position as an INS border inspector provided him the freedom to knowingly look away when contraband was brought into the United States. The fact that he received income from persons carrying contraband or sneaking into the United States increased the likelihood that this receipt of income would not be discovered by the IRS. It is extremely difficult to discover this income or the failure to report it because there is no way to track the money that is changing hands. Persons carrying contraband or entering the United States illegally are not going to report any payments to facilitate these activities to the government.

▆▆▆ Defendant argues that he did not hold a position of trust with respect to the victim of the tax crimes, the IRS. To support the abuse of trust enhancement, "a position of trust ... must be established from the perspective of the victim." *United States v. Hill,* 915 F.2d 502, 506 n. 3 (9th Cir.1990); *see also United States v. Barnes,* 125 F.3d 1287, 1292 (9th Cir.1997). Defendant views the victim of his crimes too narrowly. The victim of tax crimes is the United States government, not simply the IRS. The IRS is a collection and enforcement agency but they are not the beneficiary of taxpayers' money. Tax collection is performed on behalf of the United States government. The United States government is the true victim of these

crimes. As an INS border inspector, Defendant held a position of trust vis-a-vis the victim of the crime, the United States Government.

The government correctly asserts that even if the IRS is considered the sole victim of the crimes the trust enhancement was properly applied. Defendant's conduct was a breach of the trust placed in him by his employer the INS. That abuse of trust supports the enhancement in this case. In applying the abuse of trust adjustment, the sentencing court must consider all relevant conduct as well as the conduct involved in the offense of conviction. *See United States v. Duran*, 15 F.3d 131, 133 (9th Cir.1994); U.S.S.G. ch. 3, pt B, introductory cmt. ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), *i.e.*, all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction."). With respect to offenses that must be grouped under U.S.S.G. § 3D1.2(d), relevant conduct includes all acts committed by the defendant that were part of the same course of conduct or common scheme or plan as the offense of conviction. *Id.* Tax offenses are among the offenses that are subject to grouping under U.S.S.G. § 3D1.2(d). Therefore, in this case, it was proper for the district court to consider facts that were related to the same course of conduct or common scheme or plan, but not a part of, the tax offenses. *Duran*, 15 F.3d at 134. Defendant's illegal conduct as an INS inspector is clearly relevant conduct that may be considered in assessing the abuse of trust sentencing enhancement.

**3. Defendant's Position of Trust**

Defendant finally asserts that he lacked discretion in the exercise of the duties of his position and that the abuse of trust enhancement therefore cannot be applied to him. Public or private trust, as considered for the abuse of trust enhancement, refers to "a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3, cmt. n. 1. As a border inspector for the INS, even as a new recruit, Defendant had wide discretion in deciding whom to admit into the United States. Further, as a cross-designated agent for the United States Customs Service, Defendant had discretion in deciding what vehicles to check for contraband. The fact that he had no more discretion than any other inspector does not negate the position of wide discretion and trust that Defendant occupied. Clearly, such a position is one of public trust characterized by professional discretion. Accordingly, the district court did not err in imposing the enhancement.

AFFIRMED.